# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

REBECCA ALLEN,                          )
                                        )
      **Plaintiff,**             )
                                        )
v.                                      )          **Case No. 3:09-0455**
                                        )          **Judge Trauger**
STHS Heart, LLC,                        )
                                        )
      **Defendant.**             )

## MEMORANDUM

Pending before the court is the Motion for Summary Judgment filed by defendant STHS Heart, LLC (Docket No. 9), two Motions for Partial Summary Judgment filed by plaintiff Rebecca Allen (Docket Nos. 12 and 16), the parties' responses (Docket Nos. 25, 38, and 40), and the parties' replies (Docket Nos. 30, 42, and 44).  Also pending are four Motions to Strike and a Motion to Deem Admitted filed by the plaintiff (Docket Nos. 32, 36, 46, 50, and 55) and the defendant's responses (Docket Nos. 35, 48, 52, 57, and 63).  For the reasons discussed below, the defendant's motion will be granted in part and denied in part, and the plaintiff's motions will be denied.

## FACTS

Plaintiff Rebecca Allen worked in the cash application/billing department of defendant STHS Heart, LLC ("St. Thomas"), which operates the St. Thomas Heart clinic at St. Thomas

1

Hospital in Nashville, Tennessee.[1]  In August 2008, St. Thomas terminated Allen, citing her

repeated misconduct.  Allen contends that the firing was illegally motivated by the protected

leave she took pursuant to the Family and Medical Leave Act ("FMLA").

St. Thomas hired Allen in 2006.  Her direct supervisor was Stephanie Jarrett, the Cash

Applications Supervisor, who in turn reported to Carolyn Manning, the Director of the Patient

Accounting Department.  Allen soon fell into a pattern of tardiness and poor attendance.  In an

effort to address these issues, in October 2007, the defendant changed her scheduled daily start

time from 8 a.m. to 9 a.m.

St. Thomas's practice is to document disciplinary issues through written "Employee

Conference Reports," or ECRs.  On December 10, 2007, Allen received an ECR indicating that,

to that point in 2007, she had three unscheduled absences and 12 incidents of tardiness.  (Docket

No. 33, Ex. 6 at 62.)  A separate ECR dated December 10, 2007 stated that Allen was receiving

additional discipline for working unauthorized overtime, talking excessively during work, and

failing to use her work time wisely.  (Docket No. 9, Ex. 10 at 6.)

Allen had further attendance problems later that month.  She showed up on December 26,

2007, but left after stating that she was unable to remain at work.  She then failed to report to

work on December 27 or 28.  This led to another ECR, which was issued on December 31, 2007.

---

[1] Unless otherwise noted, the facts are drawn from the parties' statements of facts
(Docket Nos. 11, 14, 20, and 26), the responses thereto, and related exhibits.  Although facts are
drawn from submissions made by both parties, on a motion for summary judgment, the court
draws all reasonable inferences in favor of the non-moving party.  *Matsushita Elec. Indus. Co. v.
Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Brown v. United States*, 583 F.3d 916, 919 (6th
Cir. 2009).

2

(Docket No. 33, Ex. 6 at 64). The ECR noted that Allen "mentioned to [Jarrett] that she was trying to get in to see her physician and get FMLA paperwork faxed over to HR." (*Id.*) It also stated that Allen told her supervisors that her pre-December 26 absences and tardiness were all "traffic related" and that she could not leave her house earlier because "she had to get her son off to school."[2] (*Id.*; *see also* Docket No. 27 ¶¶ 22-23 (admitting the accuracy of the ECR).) Because of Allen's continuing infractions, her supervisors placed her on a 90-day probation on December 31. (Docket No. 33, Ex. 6 at 64.)

Around this time, Allen was diagnosed with fibromyalgia, a medical condition that causes her occasional pain, fatigue, and numbness in the limbs. According to the plaintiff, these symptoms are particularly severe in the morning, and they are sometimes so severe that she cannot get out of bed or operate a telephone. Following the December 26-28 absences, Allen applied for intermittent FMLA leave, initially submitting the forms in late December or early January. The defendant's Director of Human Resources, Teresa Daniel, mailed Allen a letter on March 23, 2008 approving the FMLA request, but the letter was mailed to an incorrect address. Allen did not actually receive the notification until June 24, 2008. Regardless, the parties agree that St. Thomas granted Allen's FMLA request, retroactively effective as of March 6, 2008.[3]

Allen's bouts of fibromyalgia resulted in a number of absences and late starts. On April

---

[2] The plaintiff testified that her daily drive from home to work took between 45 minutes and two hours, depending on traffic.

[3] The plaintiff points out that the defendant never "expunged" the 90-day probation, which was based partly on the December 26-28 absences, from her record. But Daniel testified that she did not take the December 26-28 absences into account when deciding to fire Allen because "[Allen] was able to get [her FMLA request] in to us." (Docket No. 33, Ex. 3 at 52.)

3

4, 2008, Allen received an ECR for "inappropriate behavior" because, after arriving to work late because of her fibromyalgia, she responded to her supervisor's questions by saying that she "felt like shit." (*Id.*, Ex. 4 at 48.) Allen received another ECR for tardiness on April 10, 2008, although this incident was unrelated to her medical condition.

Allen was again disciplined in late May 2008. On May 19, she arrived to work 17 minutes late, and on May 20, she arrived 22 minutes late. On both days, she failed to call in advance to notify her supervisor. (*See id.*, Ex. 1 at 117-18.) On May 21, Allen called her supervisor 55 minutes after her scheduled start to report that she was going to be late, and she arrived 90 minutes late. These incidents were due to Allen's fibromyalgia, and Jarrett counted the tardiness as being covered by the FMLA.[4] Jarrett issued Allen an ECR, however, for failing to give appropriate notice on all three days. The ECR, which Allen refused to sign, stated that, "[p]er policy, employee should contact her Supervisor prior to the start of her scheduled shift." (*Id.*, Ex. 2 at 66.) It further stated that "[Allen] was counseled on 4/10/2008 for failure to give appropriate notice and was issued a verbal warning."[5] (*Id.*) As discussed below, the parties dispute whether the defendant's attendance policy did, in fact, require Allen to call in ahead on days when her fibromyalgia caused her to arrive late to work.

Allen's affidavit states that, in addition to the May incidents, her fibromyalgia caused her

---

[4] Jarrett kept a calendar that tracked Allen's absences and incidents of tardiness. May 19-21, as well as numerous other days in 2008, were coded with an "F," indicating that the tardiness or absence was related to Allen's FMLA-qualifying condition. (*See* Docket No. 33, Ex. 2 at 80.)

[5] The written ECR issued on April 10 did not refer to such counseling, however. (Docket No. 33, Ex. 2 at 69.)

4

to be tardy or absent on February 11 and 28,[6] March 27-28, July 20 and 30-31, and August 7, 14, 19, and 20, 2008.  (Docket No. 18 ¶ 21.)  She claims that she informed Jarrett that these were FMLA-protected absences or late starts "either before [she] took the leave, when [she] arrived to work, or as soon as practicable on each such occasion."  (*Id.*)  An ECR dated July 14, 2008 indicates that Allen received a verbal warning for several instances of "disturbing others," holding excessive personal conversations, and using the internet to visit personal web sites.  (Docket No. 33, Ex. 2 at 72.)  In August 2008, Jarrett drafted another ECR disciplining Allen for being absent or tardy without giving proper pre-shift notice on July 23 and 31 and August 7, 14, 19, and 20.  The ECR stated that Allen was being placed on probation due to her "continued failure to contact [Jarrett] when she is unable to report to work on time."  (*Id.*, Ex. 9 at 5.)  Jarrett emailed the ECR to Daniel for review on August 22, 2008.  (*Id.* at 4.)

That ECR was never issued, however, because an incident that occurred the next day led to Allen's termination.  Employees in Allen's department were required to work on Saturday, August 23.  Jarrett had announced that all employees were expected to arrive to work at 8 a.m.; the plaintiff's statement of facts admits that 8 a.m. was "the time Ms. Jarrett had asked everyone to arrive."  (Docket No. 26 ¶ 70.)

Allen arrived to work shortly after 8:30 a.m.          Allen's affidavit gives the somewhat

---

[6] Allen's affidavit states that Jarrett and Manning drafted an ECR after the February dates stating that Allen would be discharged, but that they retracted the ECR after Allen argued that the absences were FMLA-related.  (Docket No. 18 ¶ 22.)  Jarrett testified that she did not remember any such ECR, although she could not deny that she discussed the February absences with Allen.  (Docket No. 33, Ex. 8 at 67-68.)  The questioning at Jarrett's deposition did not mention any decision to terminate Allen in February.

5

contrary explanations that (1) she did not believe that she was required to be at work at 8 a.m. because her usual start time was 9 a.m., and (2) she arrived after 8 a.m. because of her fibromyalgia. (Docket No. 28 ¶¶ 4-5.) No evidence indicates that Allen informed the defendant that her fibromyalgia caused her to be tardy on August 23. Her affidavit simply notes that none of her supervisors asked her why she arrived late.

Once at work, Allen began discussing St. Thomas's new software system with her co-workers. Jarrett had previously instructed employees to not discuss the software, and when she noticed the conversation, she instructed Allen to get back to work. According to Allen, Jarrett had allowed her co-workers to discuss the topic but "flipped" once Allen joined in the conversation. Allen claims that Jarrett yelled at her and made references to her tardy arrival. The defendant claims that Allen argued with Jarrett before returning to her seat.

On the following Monday, August 25, 2008, Allen was suspended without pay. Manning investigated the incident and took written statements from the employees who witnessed the incident.[7] On August 28, Manning issued an ECR that described Allen's behavior as "defiant and insubordinate" and stated that Allen "continu[ed] to argue after [she] had been asked more than once to sit down and go to work." (Docket No. 33, Ex. 7 at 80-81.) The ECR stated:

> [T]here is a pattern of inappropriate behavior that you continue to display in the work place that is disruptive, disrespectful, and non productive.
>
> I have come to the conclusion that there is a pattern and history of disrespecting your supervisor. On April 4, 2008 you were given a

_____

[7] The plaintiff claims that Manning did not take her statement, but on August 27, Allen emailed her account of the events to Manning. (Docket No. 30, Ex. 1.)

6

> written warning because of using inappropriate language with
> Stephanie Jarrett when she asked you why you reported late to
> work.  You stated "I felt like shit."  Also your behavior towards me
> was very inappropriate as I have described above.  This type of
> behavior cannot be tolerated therefore I have concluded to
> terminate your behavior [sic] effective immediately.

(*Id.* at 81.)  The ECR did not mention any violation of the defendant's attendance policy.

Allen was officially fired on or around August 28, 2008.  It is undisputed that Manning, Daniel, and COO David Kirchoff were the relevant decision-makers.[8]  Daniel testified that the plaintiff was discharged in part for her repeated failure to contact her supervisor before her shift on days when she was tardy, including on May 19-21, 2008.  (*Id.*, Ex. 3 at 47-48.)  Daniel also initially testified that she "believe[d]" that she took into account an assumption that, on April 4, 2008, Allen had not called in before her shift.  (*Id.* at 149.)  At Daniel's second deposition, however, she reviewed the ECR and clarified that the incident factored into her decision because it was a "continuation of [Allen's] pattern of . . . [n]ot following guidelines, using inappropriate language and those types of patterns of inappropriate behavior."  (*Id.*, Ex. 6 at 189-90.)  Daniel did not recall if, at the time she recommended Allen's discharge, she believed that Allen had failed to call in before her April 4 shift.  (*Id.* at 190-91.)

One of Allen's co-workers, Marcum Stewart, testified that Jarrett had long resented Allen's frequent tardiness:

> A.      For months they were trying to get rid of [Allen].
> Stephanie –

---

[8] Although Kirchoff reviewed the termination decision, he relied largely on Daniel's recommendation that St. Thomas fire Allen.

Q.      Who?

A.      Stephanie [Jarrett].  She could not stand [Allen], if we're just going to get down to it.

Q.      Prior to this incident on the last day that you worked with [Allen], did Ms. Jarrett in your presence or to your knowledge make other similar derogatory remarks about Ms. Allen's attendance?

A.      Yes. . . .  She always talked about how [Allen] was late, how she thought that it was unfair that she would – could stroll in at 9:00, 9:05, 9:10 every morning and that she felt that the FMLA was just an excuse for her to come in late.

Q.      Did she express that she did not believe that Ms. Allen actually had a real illness?

A.      Yes, she did.

(*Id.*, Ex. 12 at 24-25.)

St. Thomas's attendance policy defines procedures that employees are required to follow when they are absent or tardy.  Specifically, it states:

E.      Tardiness

1.      When possible, an employee who anticipates that he/she will be more than 15 minutes late for work must contact his or her supervisor, or other designated individual within the department, prior to the beginning of the shift.  The employee should provide a reason for the tardiness and give an expected time of arrival. Excessive incidents of tardiness will be tracked and will follow the progressive discipline process outlined in section D.[9]

---

[9] The discipline policy provides that a full-time employee will be put on a six-month probation when they reach six absences, 12 incidents of tardiness, or a combination of 14 incidents of tardiness or absences.  (Docket No. 56, Ex. 3 at 104.)  Further absences or incidents of tardiness "may result in further disciplinary action, up to and including dismissal."  (*Id.*) Additionally, the policy provides that "[a]n employee who receives three written warnings for

8

> 2.    An employee is tardy if he or she clocks in after the
> scheduled start time, regardless of whether or not the employee has
> called in to report that he or she will be late.  In keeping with this
> policy the department may develop specific guidelines that will
> meet the needs of their department.  (There will be a 5 minute
> grace period after the scheduled start time for employees[.])

(Docket No. 56, Ex. 3 at 105.)  The policy also provides that "[a]bsences or instances of lateness

covered by an employee's use of approved FMLA leave are not considered grounds for

disciplinary action."  (*Id.* at 105-06.)

The parties dispute exactly how this attendance policy applied to the plaintiff.  Noting the

policy's language that a department "may develop specific guidelines that will meet the needs of

their department," the defendant contends that Manning and Jarrett were empowered to require,

and did require, billing department employees to call in at least one hour before the start of their

scheduled shift if they anticipated being tardy.  Jarrett testified that this was the policy that she

generally applied, (Docket No. 33, Ex. 8 at 62), and Daniel testified that the one-hour call-in

requirement was acceptable under the company-wide attendance policy.[10]  (*Id.* at 176-77).

Allen's co-worker, Marcum Stewart, testified that his understanding of the general tardiness

policy was that employees were required to "call at least an hour ahead of [their scheduled start],

or as close to an hour as you can if you know for a fact that you're going to be late."  (*Id.*, Ex. 12

at 29-30.)  According to Stewart, the employees "all knew to call ahead of time."  (*Id.* at 28.)

---

attendance within a rolling 12-month period may be dismissed."  (*Id.*)

[10] Daniel testified that a department manager cannot, on her own authority, create an
attendance policy regarding FMLA leave that is more restrictive than the FMLA policy in the
handbook.  (Docket No. 33, Ex. 3 at 77-78.)  Daniel's understanding, however, was that the one-
hour policy was not stricter than the written policy.  (*Id.*, Ex. 6 at 178-79.)

9

Daniel testified that St. Thomas's tardiness and notice policies applied equally to employees taking FMLA leave. (*Id.*, Ex. 6 at 175-75.) She further testified that she told Jarrett and Manning that they "needed to make sure that Ms. Allen knew that if she was going to be late . . ., she needed to contact, call you to let you know." (*Id.*, Ex. 6 at 207.) Manning testified that she recalled that the one-hour call-in policy applied to employees using FMLA leave, (*id.*, Ex. 7 at 52-53), and that employees were required to follow the usual call-in procedures "unless [they] were medically incapable of calling an hour before [their] shift started." (*Id.* at 116.)

The plaintiff contends that any department-specific one-hour call-in policy was invalid, because it was stricter than the company-wide attendance policy. Furthermore, Allen testified that Jarrett initially told her that she was allowed to come to work late without calling in beforehand, as long as she told Jarrett upon arrival that her tardiness was caused by her fibromyalgia. (*Id.*, Ex. 1 at 118.) As Allen's direct supervisor, Jarrett had the final authority to decide whether Allen had, on a given day, complied with the applicable attendance rules.

Portions of Jarrett's deposition testimony lend support to the plaintiff's view:

> Q.      What exactly were the rules that Ms. Allen had to abide by in order to have her FMLA leave approved by you on a given day?
>
> A.      She would have had to tell me directly that she was out for her condition, for her FMLA.
>
> Q.      When would she have to give you that information?
>
> A.      Whenever she reported to me. . . .
>
> Q.      . . . [I]f Ms. Allen reported to work late but she told you at the time she reported to work late that she was late because of her FMLA illness, then her lateness *and her failure to previously notify of her lateness* was excused; is that correct? . . .

10

A. Under FMLA.

(*Id.*, Ex. 8 at 46-48 (emphasis added).)

Jarrett further explained:

A. If Rebecca reported to work late and did not contact me prior to the beginning of her shift that she was going to be late; *and, once she did report to work, did not state to me the reason for her being tardy was due to her FMLA-qualifying reasons*, yes, she would have been disciplined.

Q. Okay. If she did tell you that the reason she was late was due to her FMLA-qualifying reasons, would she be disciplined in any way?

A. No.

(*Id.* at 50 (emphasis added).)

Jarrett testified that she "made a mistake" in disciplining Allen in May 2008 for her "fail[ure] to contact her supervisor to advise she would be late reporting to work."[11] (*Id.* at 52-53.) In any event, Allen testified that, after she received the May 2008 ECR, Jarrett told her that she was required to call in one hour before her shift if she was "physically capable" of doing so. (*Id.*, Ex. 1 at 123.)

After her termination, the plaintiff filed this suit, asserting claims for interference and retaliation under the FMLA and claims for discrimination and failure to accommodate under the

---

[11] Daniel testified that this portion of Jarrett's testimony was "inaccurate." (Docket No. 33, Ex. 6 at 184.) Jarrett gave seemingly contradictory testimony later in her deposition, stating that she "[doesn't] know" whether the one-hour call-in policy applied when Allen took FMLA leave and that she "would assume that a handbook would apply to all employees." (*Id.*, Ex. 8 at 63.)

Americans with Disabilities Act and analogous Tennessee statutes.

<u>**ANALYSIS**</u>

The defendant has filed a Motion for Summary Judgment seeking dismissal of the plaintiff's entire case, and the plaintiff has filed two Motions for Partial Summary Judgment regarding her FMLA interference claim.

**I.        Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) requires the court to grant a motion for summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the [plaintiff]." *Moldowan*, 578 F.3d at 374.

"'[T]he judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient," and the plaintiff's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine"

only if a reasonable jury could find for the plaintiff.  *Moldowan*, 578 F.3d at 374 (citing

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## II.     FMLA Claims

The plaintiff asserts interference and retaliation claims under the Family and Medical

Leave Act, 29 U.S.C. § 2601 *et seq.*  Allen's primary argument is that the defendant improperly

took her tardiness on April 4 and May 19-21 into account when deciding to fire her.

The FMLA provides that an eligible employee is entitled to up to twelve weeks of

medical leave in a year in the event of  "'a serious health condition that makes the employee

unable to perform the functions of the position of such employee.'"  *Wysong v. Dow Chem. Co.*,

503 F.3d 441, 446 (6th Cir. 2007) (quoting 29 U.S.C. § 2612(a)(1)(D)).  The Sixth Circuit

recognizes two theories for recovery under the FMLA: "the interference theory, pursuant to 29

U.S.C. § 2615(a)(1), and the retaliation theory, pursuant to 29 U.S.C. § 2615(a)(2)."  *Id.*

### A.      Interference Claim

Allen claims that St. Thomas unlawfully interfered with her FMLA rights.  The FMLA

makes it illegal for an employer to "interfere with, restrain, or deny the exercise of or the attempt

to exercise, any right provided under [the FMLA]."  29 U.S.C. § 2615(a)(1).  To prove a prima

facie case of interference, a plaintiff must show that: "(1) [she] is an '[e]ligible employee'; (2)

the defendant is an '[e]mployer'; (3) the employee was entitled to leave under the FMLA; (4) the

employee gave the employer notice of [her] intention to take leave; and (5) the employer denied

the employee FMLA benefits to which [she] was entitled."  *Wysong*, 503 F.3d at 447 (quoting

*Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003)) (citations omitted) (second

13

and third alterations in original).

Here, the first three elements are not in dispute. Regarding the final element, "[i]f an employer takes an employment action based, in whole or in part, on the fact that the employee took FMLA-protected leave, the employer has denied the employee a benefit to which he is entitled." *Id.* An employer is thus liable for interference if it uses FMLA leave as one factor in deciding to terminate an employee.[12] *Id.* at 448.

The defendant concedes that it based its decision to fire Allen partly on the fact that she repeatedly failed to notify her supervisor of her fibromyalgia-related tardiness before her shift started.[13] The plaintiff argues that, in doing so, the defendant was effectively punishing her for taking FMLA leave. She argues that the defendant was barred from enforcing this policy against employees who arrive late for FMLA-protected reasons, because the policy is stricter than the requirements of the FMLA. (Docket No. 13 at 11-15.)

In response, the defendant argues that there is a distinction between (1) disciplining an employee for taking FMLA leave and (2) disciplining an employee for failing to follow generally applicable attendance notification procedures when taking FMLA leave. (Docket No. 10 at 16.) It points out that Department of Labor regulations explicitly allow employers to deny

---

[12] Such conduct can also form the basis of an FMLA retaliation claim. *See Wysong*, 503 F.3d at 447 n.2.

[13] The plaintiff argues that this policy, which applied to employees in the cash application/billing department, was invalid because it was stricter than the requirements listed in the company-wide policy. (Docket No. 13 at 16-18.) But the company-wide policy allowed departments to formulate their own rules, and all the relevant testimony indicates that (1) the department did, in fact, enforce the pre-shift call-in requirement, and (2) the employees knew of this policy.

14

FMLA leave if employees fail to "'comply with the employer's usual and customary notice and procedural requirements for requesting leave.'" (Docket No. 10 at 16-17 (quoting 29 C.F.R. § 825.303(c).) According to the defendant, Allen failed to give proper notice of her intention to take FMLA leave, because she did not comply with the call-in requirements.

Before 2009, the relevant regulation, 29 C.F.R. § 825.303, simply required employees to give notice of unforeseeable FMLA leave "as soon as practicable":

> (a) When the approximate timing of the need for leave is not foreseeable, an employee should give notice to the employer of the need for FMLA leave as soon as practicable under the facts and circumstances of the particular case. It is expected that an employee will give notice to the employer within no more than one or two working days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible. . . .

> (b) The employee should provide notice to the employer either in person or by telephone, telegraph, facsimile ("fax") machine or other electronic means.

60 Fed. Reg. 2180, 2258 (Jan. 6, 1995) (to be codified at 29 C.F.R. § 825.303). Section 825.302, an analogous provision that covers notice for foreseeable leave, specified that "'[a]s soon as practicable' means as soon as both possible and practical, taking into account all of the facts and circumstances in the individual case." 60 Fed. Reg. at 2257 (to be codified at 29 C.F.R. § 825.302(b)).

The defendant cites the current version of section 825.303, which went into effect January 16, 2009. The current regulation states that, in non-emergency circumstances, "[i]t generally should be practicable for the employee to provide notice of leave that is unforeseeable within the time prescribed by the employer's usual and customary notice requirements applicable

15

to such leave." 29 C.F.R. § 825.303(a). It specifically states that "an employer may require employees to call a designated number or a specific individual to request leave." *Id.* § 825.303(c). "If an employee does not comply with the employer's usual notice and procedural requirements, and no unusual circumstances justify the failure to comply, FMLA-protected leave may be delayed or denied." *Id.*

The plaintiff argues that the newer version of the regulation does not apply retroactively to this case. At least one district court in the Sixth Circuit has agreed, holding that the current version of section 825.303 does not apply to events occurring before 2009. *Mason v. Steelcraft, Inc.*, No. C-1-07-584, 2009 U.S. Dist. LEXIS 18821, at *26-27 (S.D. Ohio Mar. 10, 2009) (citing *Bauer v. Varity Dayton-Walther Corp.*, 118 F.3d 1109, 1112 n.1 (6th Cir. 1997)). *But see Lowery v. Strength*, 2009 U.S. App. LEXIS 27203, at *2 (11th Cir. Dec. 14, 2009) (applying current regulation to events occurring in 2004); *Daugherty v. Wabash Ctr., Inc.*, 577 F.3d 747, 751 (7th Cir. 2009) (same, for events in 2006); *Bishop v. New Process Gear, Inc.*, No. 5:06-CV-0821, 2009 U.S. Dist. LEXIS 107545, at *26-27 (N.D.N.Y Nov. 18, 2009) (same).

Ultimately, however, it is irrelevant which version of the regulation applies, because Allen did not comply with either. On the dates at issue, Allen arrived late to work because her fibromyalgia temporarily prevented her from getting out of bed or driving. But Allen's commute from home to work took at least 45 minutes. Certainly, if she was physically able to drive, she was physically able to place a phone call before leaving the house. By waiting until she arrived at work to notify her supervisor of her condition, she failed to give notice "as soon as practicable under the facts and circumstances of the particular case." 60 Fed. Reg. at 2258; *see also*

16

*Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 425 (6th Cir. 2004) (noting that an employee did not give timely notice under section 825.303(a) because he failed to notify his employer of unforeseeable FMLA leave once he was "physically able to" do so); *Valdivia v. BNSF Ry. Co.*, No. 07-2467, 2009 U.S. Dist. LEXIS 10828, at *16-21 (D. Kan. Feb. 12, 2009) (finding that an employee who suffered a migraine, took medication, and slept through his shift did not give notice as "soon as practicable" when he called after his scheduled shift had ended, as opposed to calling when he took the medication). The discipline that Allen received regarding her refusal to call ahead does not support an interference claim, because, on those occasions, she did not properly give her employer "notice of [her] intention to take leave." *Wysong*, 503 F.3d at 447 (citation omitted).

Nevertheless, the plaintiff cites *Cavin v. Honda of America Manufacturing, Inc.*, 346 F.3d 713 (6th Cir. 2003), and argues that St. Thomas was prohibited from enforcing its call-in policy against employees taking FMLA leave. In *Cavin*, the plaintiff suffered a motorcycle accident and missed one week of work. Although he called his employer's security department each day to notify them of his continuing absence, he failed to call the employer's Leave Coordination Department within three days of his first absence, as required by the employer's leave policy. *Id.* at 716-17. Because of this failure, the employer subsequently denied a portion of the plaintiff's requested FMLA leave, and the plaintiff was forced to use vacation time to cover the absence. *Id.* at 717.

The *Cavin* court noted that "the FMLA does not permit an employer to limit his employee's FMLA rights by denying them whenever an employee fails to comply with internal

procedural requirements that are more strict than those contemplated by the FMLA." *Id.* at 720. It found that the defendant's policy was more stringent because FMLA regulations "do not strictly limit the timing of the notice when an employee's need for leave is not foreseeable." *Id.* at 720 n.6. The court held that "employers cannot deny FMLA leave on grounds that an employee failed to comply with internal procedures – as long as 'the employee gives timely verbal or other notice.'" *Id.* at 722 (quoting 29 C.F.R. § 825.302(d)). The court then held that the plaintiff's act of calling security, notifying them that he was in a motorcycle accident, and thereafter calling security each day he was absent was, at the summary judgment stage, sufficient to show that he gave notice to the employer that he needed FMLA leave. *Id.* at 725.

There are several key differences between *Cavin* and the instant case. First, the defendant here did not deny Allen's request for FMLA leave; it credited Allen with the leave but separately disciplined her for failing to give sufficient notice. *Cavin* dealt solely with whether an employer may deny FMLA leave. Second, the *Cavin* plaintiff did, in fact, give timely notice that he was going to be absent, even though he did not comply with the letter of the employer's policy. Here, as explained above, the notice that Allen gave after arriving at work late was not timely. Under the circumstances of this case, St. Thomas's requirement that Allen call in before her shift was not stricter than the FMLA requirement that employees give notice "as soon as practicable." *See Knox v. Cessna Aircraft Co.*, No. 4:05-CV-131, 2007 U.S. Dist. LEXIS 71528, at *15 (M.D. Ga. Sept. 26, 2007) ("An employer's policy that requires employees to call in to work when they will be absent is clearly consistent with FMLA and its regulations because the regulations themselves require that employees give notice of the need for unforeseeable leave as

18

soon as practicable.").

In a case that is both more relevant and more recent than *Cavin*, the Sixth Circuit held that employers may enforce reasonable, generally applicable sick leave policies against employees taking FMLA leave. *Allen v. Butler County Comm'rs*, 331 Fed. Appx. 389, 396 (6th Cir. 2009). In *Allen*, the defendant employer's attendance policy required employees to call in each day they were absent. *Id.* at 391. The plaintiff took leave that was tentatively classified as FMLA leave; on one day, the plaintiff failed to call in. *Id.* at 392. This resulted in discipline and was taken into account when the employee was eventually terminated. *Id.*

The court noted that the question – "whether an employee on FMLA leave may be terminated for violating the more stringent requirements of a concurrent paid sick leave policy" – was one of first impression for the Sixth Circuit.[14] *Id.* at 394. The court answered in the affirmative, because the defendant's call-in policy "neither conflict[ed] with nor diminishe[d] the protections guaranteed by the FMLA." *Id.* at 396. In explaining its reasoning, the court quoted extensively from a Third Circuit case that allowed an employer to require employees on sick leave to call a hotline each time they left the house:

> "[T]his policy . . . 'neither prevents employees from taking FMLA leave nor discourages employees from taking such leave. *It simply ensures that employees to not abuse their FMLA leave*.' . . . [T]he *call-in procedure does not serve as a pre-requisite to entitlement of FMLA leave*. Rather, the procedure merely sets forth

---

[14] As in *Allen*, the instant plaintiff's FMLA leave ran concurrently with her paid leave. The letter approving the plaintiff's FMLA leave stated: "The Heart Group will require that you use your accrued benefit time for blocks of intermittent [FMLA leave]. Should you exhaust applicable benefit time the remainder of your leave will be unpaid." (Docket No. 33, Ex. 2 at 78.)

19

obligations of employees who are on leave, regardless of whether the leave is pursuant to the FMLA. . . . *Nothing in the FMLA prevents employers from ensuring that employees who are on leave from work do not abuse their leave*, particularly those who enter leave while on the employer's Sick Abuse List."

*Id.* at 395 (quoting *Callison v. City of Philadelphia*, 430 F.3d 117, 120-21 (3d. Cir. 2005).

Here, as in *Allen*, the defendant's call-in policy is a reasonable requirement that is aimed at ensuring that employees do not abuse their leave. It is also aimed at "keep[ing] the employer informed about the employee's plans."[15] *Id.* at 394 (citation omitted). Because the policy does not discourage employees from taking FMLA leave and does not conflict with the FMLA, St. Thomas may enforce it against employees who are taking FMLA leave. Thus, the defendant was not prohibited from taking Allen's repeated failure to follow the policy into account when deciding to fire her. *See Lee v. City of Columbus*, No. 2:07-cv-1230, 2009 U.S. Dist. LEXIS 66644, at *13-15 (S.D. Ohio July 31, 2009) (dismissing interference claim premised on employer enforcing its internal call-in policy because the policy "neither prevents employees from taking FMLA leave nor discourages employees from taking FMLA leave"); *Nelson v. Wayne State Univ.*, No. 08-13633, 2009 U.S. Dist. LEXIS 106056, at *18 (E.D. Mich. Nov. 13, 2009)

---

[15] As the Department of Labor recognized when formulating the most recent version of its FMLA regulations, "call-in procedures are a routine part of many workplaces and are critical to an employer's ability to manage its work force. Adherence to such policies is even more critical when the need for leave is unforeseen." 73 Fed. Reg. 67934, 68009 (Nov. 17, 2008); *see also Spraggins v. Knauf Fiber Glass GmbH, Inc.*, 401 F. Supp. 2d 1235, 1239 (M.D. Ala. 2005) ("Without some notice of intended leave, employers cannot make reasonable arrangements to fill in for the employee who is absent on FMLA leave. Surely Congress did not intend that employees could take FMLA leave willy-nilly, regardless as to whether they were able to give notice before their workday began, as long as they gave notice within two days of learning of the need for the leave.").

Case 3:09-cv-00455   Document 64   Filed 05/21/10   Page 20 of 30 PageID #: 4361

("Because Plaintiff was terminated for failing to comply with [the defendant's] call-in policy, and he would have been terminated irrespective of whether the absences were related to FMLA leave, he does not state an interference claim under the FMLA.").

The defendant may be equitably estopped, however, from punishing Allen for certain violations of the call-in policy. The Sixth Circuit has held that, "under the right circumstances, an employer may be equitably estopped from challenging an employee's entitlement to [FMLA] leave.'" *Dobrowski v. Jay Dee Contrs., Inc.*, 571 F.3d 551, 555 (6th Cir. 2009) (quoting *Sorrell v. Rinker Materials Corp.*, 395 F.3d 332, 336 (6th Cir. 2005)) (alteration in original). Specifically, a defendant must show: "(1) a definite misrepresentation as to a material fact, (2) a reasonable reliance on the misrepresentation, and (3) a resulting detriment to the party reasonably relying on the misrepresentation." *Id.* at 557.

Although the defendant does not dispute Allen's entitlement to FMLA leave, the same equitable principles extend to the defendant's enforcement of its attendance policy on days when Allen took FMLA leave. There is enough evidence for a jury to reasonably conclude that, before May 21, 2008, Allen's supervisor told her that she did not need to follow the generally applicable call-in procedure when her fibromyalgia caused her to arrive late. This is supported by both Allen's and Jarrett's testimony. Indeed, Jarrett stated at her deposition that it was a "mistake" to discipline Allen for her failure to follow the call-in policy on May 19-21. If Allen reasonably relied on her supervisor's instructions to not give pre-shift notice of tardiness in April and May, the defendant was estopped from taking those attendance policy violations into account in its decision to fire Allen.

21

In addition, there is testimony from one of Allen's co-workers that Jarrett was trying to "get rid of" Allen because she was annoyed by Allen's frequent tardiness and doubted the legitimacy of her illness. (Docket No. 33, Ex. 12 at 24-25.) This supports a finding that the various discipline initiated by Jarrett in 2008 was motivated by the fact that Allen frequently took intermittent FMLA leave. If true, such discipline would certainly be "an employment action based, in whole or in part, on the fact that the employee took FMLA-protected leave" and would support an interference claim. *Wysong*, 503 F.3d at 447.

In sum, the court finds that the defendant is not liable simply because it enforced its generally applicable attendance policy against Allen. But because there are questions of fact as to (1) whether the defendant was equitably estopped from enforcing the attendance policy and (2) whether Jarrett's discipline against Allen was motivated by her resentment of Allen's FMLA leave, the court cannot grant summary judgment in favor of either party on Allen's interference claim.[16]

## B. Retaliation Claim

Allen also claims that the defendant's actions constitute unlawful retaliation. The FMLA makes it illegal for an employer "to discharge or in any other manner discriminate against any

---

[16] One of the plaintiff's Motions for Partial Summary Judgment seeks (1) an award of backpay, prejudgment interest, and liquidated damages on her FMLA interference claim, (2) a determination that the jury may consider granting her front pay if reinstatement is not feasible or appropriate, and (3) an equitable "tax enhancement" on her damages. (Docket No. 17 at 1-2.) Because the court is not granting summary judgment on the interference claim, this motion will be denied.

The court will also leave for the jury the question of whether any FMLA violation by the defendant was willful. (*See* Docket No. 10 at 18-19.)

individual for opposing any practice made unlawful by [the FMLA.]"  29 U.S.C. § 2615(a)(2).

To prove a prima facie case of retaliation, the plaintiff must show that: (1) she availed herself of

a protected right under the FMLA; (2) she was adversely affected by an employment decision;

and (3) there was a causal connection between the exercise of the right and the adverse

employment decision.  *Skrjanc v. Great Lakes Power Serv.*, 272 F.3d 309, 314 (6th Cir. 2001).

As is the case with an interference claim, employers may not "use the taking of FMLA leave as a

negative factor in employment actions."  *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 707

(6th Cir. 2008) (citation omitted).

     Under the familiar burden-shifting *McDonnell Douglas* framework, a plaintiff may use

circumstantial evidence to show that the employer acted with a retaliatory motive. *Id.*; *see also*

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  If the plaintiff makes a prima facie

showing, "the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory

reason for the adverse employment action" and then "shifts back to the plaintiff to show that the

defendant's proffered reason is a pretext for unlawful discrimination."  *Bryson v. Regis Corp.*,

498 F.3d 561, 570 (6th Cir. 2007).  If direct evidence of discrimination exists – "evidence which,

if believed, requires the conclusion that unlawful discrimination was at least a motivating factor

in the employer's actions" – the court does not need to proceed with a *McDonnell Douglas*

analysis.  *Daugherty*, 544 F.3d at 707 (citation omitted).

     One of Allen's co-worker's, Marcum Stewart, testified that Jarrett did not believe that

Allen had a real illness and that he overheard Jarrett making "derogatory remarks about Ms.

23

Allen's attendance."[17]  (Docket No. 33, Ex. 12 at 25.)  According to Stewart, Jarrett stated that "she felt that the FMLA was just an excuse for [Allen] to come in late."  (*Id.* at 25.)  He testified that Jarrett spent months "try[ing] to figure out ways to get rid of [Allen]" because of Allen's frequent tardiness.  (*Id.* at 24-25.)  This constitutes direct evidence that Jarrett acted with a retaliatory motive.  If the jury credits this testimony, it will not be required to draw any inferences to conclude that Jarrett "was predisposed to discriminate on the basis of [the FMLA]" and that she "acted on that predisposition."[18]  *Daugherty*, 544 F.3d at 707 (citations omitted) (alteration in original).  Although Jarrett did not have final authority in the decision to terminate Allen, she was responsible for supervising Allen, and the discipline that Jarrett initiated led directly to Allen's firing.

The defendant makes the conclusory assertion that Stewart's testimony "does not establish anything" and points out that Jarrett herself "specifically testified that she was not out to get Plaintiff or otherwise discriminate against her."  (Docket No. 30 at 8.)  Although Jarrett's self-serving deposition testimony certainly creates an issue of material fact, it does not negate the existence of Stewart's testimony.  Accordingly, the court will not dismiss the plaintiff's FMLA retaliation claim.

## III.    ADA Claims

---

[17] The defendant implies that Stewart's testimony regarding statements made by Jarrett is hearsay.  (Docket No. 30 at 9.)  But a statement is not hearsay if, as here, it is offered against a party and is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment."  Fed. R. Evid. 801(d)(2)(D).

[18] Alternatively, even if Stewart's testimony does not constitute direct evidence of a retaliatory motive, it is circumstantial evidence that is strong enough to rebut, at the summary judgment stage, the defendant's proffered legitimate reasons for disciplining and firing Allen.

The plaintiff asserts claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, for discrimination and failure to accommodate.[19]  To prevail on either claim, the plaintiff must show that she has a "disability," as defined by the statute.  *See Mahon v. Crowell*, 295 F.3d 585, 589 (6th Cir. 2002) (listing the prima facie elements of a discrimination claim); *Denczak v. Ford Motor Co.*, 215 Fed. Appx. 442, 444 (6th Cir. 2007) (same, for an accommodation claim).

First, the court must determine whether to apply the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, § 8, 122 Stat. 3553, which became effective January 1, 2009 and essentially expanded the scope of medical conditions protected by the ADA.  In *Milholland v. Sumner County Board of Education*, 569 F.3d 562 (6th Cir. 2009), the Sixth Circuit flatly held that "the ADA Amendments Act does not apply to pre-amendment conduct."  *Id.* at 567.  Other circuits have reached the same conclusion.  *EEOC v. Agro Distrib. LLC*, 555 F.3d 462 n.8 (5th Cir. 2009); *Becerril v. Pima County Assessor's Office*, 587 F.3d 1162, 1164 (9th Cir. 2009); *Kiesewetter v. Caterpillar, Inc.*, 295 Fed. Appx. 850, 851 (7th Cir. 2008).  In *Milholland*, the plaintiff, a teacher, claimed that the defendant school district had violated the ADA by transferring her from an administrative position to a classroom teaching position because of her

---

[19] The plaintiff also asserts claims under the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 *et seq.*, and the Tennessee Handicap Act ("THA"), Tenn. Code Ann. § 8-50-103 *et seq.*  (Docket No. 1 ¶ 68.)  Claims of discrimination arising from an adverse employment decision are properly brought under the THA.  *See* Tenn. Code Ann. § 8-50-103.  The court's analysis of the plaintiff's THA claim is guided by federal ADA law, and the THA tracks the ADA in requiring that the plaintiff's impairment "'substantially limits a major life activity.'"  *Roberson v. Cendant Travel Servs.*, 252 F. Supp. 2d 573, 583 (M.D. Tenn. 2002) (quoting *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 705 (Tenn. 2000)).  Thus, the plaintiff's state law claims will track the disposition of her ADA claims.

arthritis. 569 F.3d at 564. The court noted that the ADAAA does not "expressly prescribe" that it should apply retroactively, and it determined that applying the statute would have a "'genuinely retroactive effect'" by "'attach[ing] new legal consequences to events completed before its enactment.'" *Id.* at 566 (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 270, 277 (1994)). Because the alleged adverse employment action occurred in 2006, the court held that the ADAAA did not apply. *Id.* at 567.

The plaintiff points to an unpublished opinion that pre-dates *Milholland*, in which the Sixth Circuit applied the ADAAA because the case "involve[d] prospective relief and was pending when the amendments became effective." *Jenkins v. Nat'l Bd. of Med. Examiners*, No. 08-5371, 2009 U.S. App. LEXIS 2660, at *3 (6th Cir. Feb. 11, 2009). In *Jenkins*, the plaintiff medical student had a reading disability and sought an injunction granting him extra time on an upcoming licensing examination. *Id.* at *1. The court reasoned that the ADAAA applied because, "[r]ather than seeking damages for some past act of discrimination," the plaintiff sought "the right to receive an accommodation . . . that will occur in the future." *Id.* at *3.

Despite the plaintiff's argument to the contrary, (Docket No. 25 at 21), the clear focus of the instant case is the recovery of damages for the plaintiff's termination in August 2008. Although the Complaint does vaguely seek "[i]njunctive relief preventing . . . retaliatory practices by Defendant," (Docket No. 1 at 10), the plaintiff primarily seeks damages to redress past misconduct. Furthermore, the plaintiff requests front pay in lieu of reinstatement to her former job, which would make the requested injunction moot. (*Id.*) Accordingly, the court will not retroactively apply the ADAAA and will instead use the pre-ADAAA standard to determine

26

whether the plaintiff has a protected disability.

The ADA defines "disability" as "a physical . . . impairment that substantially limits one or more major life activities," such as "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, . . . and working."[20] 42 U.S.C. § 12102(1)-(2). "Congress intended the existence of a disability to be determined in such a case-by-case manner." *Toyota Motor Mfg., Ky. v. Williams*, 534 U.S. 184, 198 (2002). "[T]o be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long-term." *Id.*

Allen's affidavit claims that her fibromyalgia causes "severe pain, fatigue, and numbness in [her] limbs, especially during the morning waking hour," that is sometimes so severe that she "cannot lift [herself] out of bed, pick up a telephone to make a phone call, or drive a car." (Docket No. 18 ¶ 6.) The parties do not dispute that these intermittent symptoms caused Allen's FMLA-protected absences and incidents of tardiness.

But "[a]n 'impairment that only moderately *or intermittently* prevents an individual from performing major life activities is not a substantial limitation' under the ADA." *Bryson*, 498 F.3d at 576 (quoting *Mahon*, 295 F.3d at 590-591) (emphasis added); *see also Brady v. Potter*, 273 Fed. Appx. 498, 502 (6th Cir. 2008) ("It is not enough for the impairment to cause merely moderate or intermittent interruptions in the performance of the activity."). According to Allen,

---

[20] The ADA also protects people who are "regarded as having" a disability, 42 U.S.C. § 12102(1)(C), but this provision is not implicated in this case.

27

her fibromyalgia caused her to be absent or tardy 18 times over the course of nine months. There is no evidence that, aside from these days, Allen's fibromyalgia limited her ability to perform any particular task. Under the pre-ADAAA standard, a medical condition that limits a person's activities twice a month – and on many of those occasions, only limits the activities for a matter of hours – does not "substantially limit" those activities. *See Lee v. City of Columbus*, 659 F. Supp. 2d 899, 908 (S.D. Ohio 2009) (finding that the plaintiff's incapacitating migraine headaches, which occurred two or three times per week, were not a qualifying disability).

Because the plaintiff's fibromyalgia is not an ADA-protected disability, the court will dismiss the plaintiff's ADA claims.

## IV. The Plaintiff's Other Motions

The plaintiff has filed three lengthy Motions to Strike that challenge most of the defendant's responses to the plaintiff's various statements of fact. (Docket Nos. 46, 50, and 55.) These motions are unnecessary and unwarranted.[21] Because the court is perfectly capable of evaluating whether the defendant's responses are supported by the record, these motions will be denied.

The plaintiff has also filed a Motion to Strike Defendant's Reply Memorandum in Support of its Motion for Summary Judgment, (Docket No. 32), on the grounds that the reply

---

[21] For example, one 50-page motion argues, *inter alia*, that the court should strike, as being "contrary to the uncontradicted evidence in the record," any assertion by the defendant that St. Thomas did not discharge Allen because she took FMLA leave. (Docket No. 55 at 1.) This issue is, of course, one of the main factual and legal disputes in this case. The extensive briefing on the parties' respective Motions for Summary Judgment adequately explains the plaintiff's view of the evidence. Revisiting the issue in a Motion to Strike is completely unnecessary.

brief exceeds the page limit and exceeds the proper scope of a reply.  The court will retroactively grant leave to exceed the page limit; the rest of the plaintiff's arguments are without merit.  This motion will be denied.

Finally, the plaintiff has filed a Motion to Deem Admitted the allegations in Paragraph 54 of the Complaint.  (Docket No. 36.)  That paragraph alleges:

> Prior to terminating Plaintiff on or around August 29, 2008, Defendant did not ask its legal counsel whether Plaintiff could be terminated on the basis of events that took place and/or allegedly took place on or around August 23, 2008.

(Docket No. 1 ¶ 54.)  In response, the defendant's Answer asserts attorney-client privilege and "further avers that it is not asserting an advice of counsel defense to Plaintiff's FMLA claim." (Docket No. 6 ¶ 54.)

The plaintiff seeks an order that deems this allegation admitted, "forever resolv[ing] negatively the question of whether Defendant sought legal counsel prior to discharging Plaintiff to ensure that it was not running afoul of the FMLA in doing so."[22]  (Docket No. 37 at 2.)  The court concludes that this is unnecessary.  If the defendant eventually seeks leave to amend its Answer or seeks to introduce evidence that it discussed the matter with counsel, the court will entertain the plaintiff's arguments at that time.  For now, the Motion to Deem Admitted will be denied.

---

[22] This is relevant because, if a defendant is found liable for violating the FMLA, a plaintiff may receive additional "liquidated damages" unless the defendant shows that it acted in good faith and "had reasonable grounds for believing that the act or omission was not a violation."  29 U.S.C. § 2617(a)(1)(A)(iii); *see also Hoffman v. Prof'l Med Team*, 394 F.3d 414, 419 (6th Cir. 2005) (finding that the defendant did not willfully violate the FMLA in part because it consulted with its attorney).

29

## **CONCLUSION**

For all of the reasons discussed above, the court will grant in part and deny in part the defendant's Motion for Summary Judgment. The plaintiff's FMLA claims will survive for trial, but the ADA and state law claims will be dismissed. The court will deny the plaintiff's Motions for Partial Summary Judgment, Motions to Strike, and Motion to Deem Admitted.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge